**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NANCY WILSON, Regional Director of the Sixth Region of the NATIONAL LABOR RELATIONS BOARD, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, | No. 4:20-CV-00524 <br><br> (Judge Brann) |
| Petitioner, | |
| v. | |
| JERSEY SHORE STEEL CO., | |
| Respondent. | |

**MEMORANDUM OPINION**

**APRIL 29, 2020**

## I.      BACKGROUND

Before the Court is the Regional Director of the Sixth Region of the National Labor Relations Board's ("NLRB") Petition for Injunction under Section 10(j) of the National Labor Relations Act, as Amended.[1]  The Regional Director seeks injunctive relief under Section 10(j) of the National Labor Relations Act ("the Act").[2]  The Regional Director requests such relief pending final dispositions of matters pending before the Board with respect to allegations that Respondent Jersey Shore Steel Co. ("Jersey Shore") has engaged in, and is engaging in, unfair

---

[1]   Doc. 1.  Respondent Jersey Shore Steel Co. has responded to the Board's Petition.  Doc. 35. And the Regional Director has submitted a reply.  Doc. 37.

[2]   *See* 29 U.S.C. § 10(j).

labor practices in violation of Sections 8(a)(1), 8(a)(3), and 8(a)(5) of the Act. Specifically, the Regional Director asserts that Jersey Shore dealt directly with its employees, engaged in bad-faith bargaining, discharged three of its employees who were members of a bargaining committee, and then, on tainted grounds, unlawfully withdrew recognition from the employees' labor union, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, Local 4907-04 ("the Union").  A hearing before one of the Board's Administrative Law Judges is scheduled to begin on June 22, 2020.[3]

The Regional Director's Petition requests that this Court, pursuant to Section 10(j) of the Act, direct Jersey Shore to appear before this Court and show cause why an injunction should not issue enjoining and restraining Jersey Shore from:[4]

a) Withdrawing recognition from the Union;

b) Failing and refusing to bargain in good faith with the Union as the exclusive collective bargaining representative of the unit employees in Montoursville, Pennsylvania;

c) Discharging, suspending, or otherwise discriminating against employees because they support or assist the Union or engage in concerted activities;

d) Disparaging the Union to its employees;

e) Threatening or impliedly threatening employees with various reprisals if they support or assist the Union;

---

[3]   Doc. 6 at 3.  The hearing was originally scheduled for March 31, 2020.  *See* Doc. 1-3 at 14.

[4]   Doc. 1 at 19-21.

f) Informing employees that it would set terms and conditions of employment without regard to their collective bargaining obligations;

g) Soliciting employees to withdraw from their Union membership;

h) Bypassing the Union and dealing directly with employees concerning their terms and conditions of employment;

i) Unilaterally, without first providing the Union with notice and the opportunity to bargain, implementing and/or making changes to the terms and conditions of employment of employees in the Unit that are mandatory subjects for the purposes of collective bargaining;

j) Failing and refusing to bargain in good faith with the Union by failing and refusing to provide the Union with the information it has requested;

k) Future violations of Sections 8(a)(1), (3) and (5) of the Act;

l) In any other manner, interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed in Section 7 of the Act.

The Petition further requests that this Court enter an Order directing Jersey Shore "to take the following affirmative actions" "pending final disposition of the matters involved herein pending before the Board":[5]

a) Immediately recognize and, upon request, bargain in good faith with the Union as the exclusive collective-bargaining representative of the unit employees in Montoursville, Pennsylvania;

b) Within five (5) days of the Court's Order, offer Adrian Brown, Ryan Stout and Zachary Taylor interim reinstatement to their former positions; or, if those positions no longer exist, to substantially equivalent positions without prejudice to their seniority or any other rights and privileges previously enjoyed, displacing, if necessary, any employee who may have been hired or reassigned to replace them;

---

[5]   Doc. 1 at 21-22.

c) Within ten (10) days of the Court's Order, rescind the suspensions issued to Adrian Brown, Ryan Stout and Zachary Taylor, and do not rely on those suspensions when issuing any future discipline;

d) Within five (5) days of any Union request, rescind any or all of the unilaterally implemented changes to employees' wages, hours, and other terms and conditions of employment; the employees may retain the unilaterally granted wage increase;

e) Within twenty (20) days of the Court's Order, provide the Union with the outstanding requested information;

f) Within five (5) days of the Court's Order, post copies of the Court's Order at Jersey Shore's Montoursville, Pennsylvania facility where notices to employees are customarily posted; said posting shall be maintained during the pendency of the Board's administrative proceedings free from all obstructions and defacements; all unit employees shall have free and unrestricted access to said postings; and

g) Within twenty (20) days of the Court's Order, file with the Court, with a copy submitted to the Regional Director of Region 6 of the Board, a sworn affidavit from a responsible Jersey Shore official setting forth, with specificity, the manner in which Jersey Shore has complied with the terms of this decree, including how it has posted the documents required by this order.

As the Petition has been fully briefed, the matter is ripe for disposition.  For the reasons that follow, the Court will grant the Petition.[6]

---

[6]  Given that the Regional Director has presented a host of affidavits and other evidence in support of the Petition, the Court does not find it necessary to order discovery or to hold a full evidentiary hearing. *See Leach v. Oliva Supermarkets LLC*, No. CIV.A. 15-3174 JLL, 2015 WL 4392097, at *2 (D.N.J. July 15, 2015); *Eisenberg v. Tubari, Ltd., Inc.*, No. 85-1857, 1985 WL 32832, at *3 (D.N.J. July 8, 1985).  Here, because of the volume of evidence that the Regional Director has submitted in supplement of the Petition, the Court finds that Jersey Shore already has information on "the issues raised by [this] petition for an injunction" and "the facts upon which the Board will rely" to support its claim of a violation of the Act. *Kobell For & on Behalf of N.L.R.B. v. Reid Plastics, Inc.*, 136 F.R.D. 575, 579 (W.D. Pa. 1991). (*quoting Kinney on Behalf of N.L.R.B. v. Chicago Tribune Co.*, No. 89 C 3829, 1989 WL 91844, at *1 (N.D. Ill. Aug. 7, 1989)).

In a related matter, the Court finds that it does not need to order a show cause hearing as the Regional Director's Petition requests.  Given the limited standard of review at this juncture,

## II.   FACTS

Jersey Shore owns and operates a steel fabrication plant in Montoursville, Pennsylvania.  The Union has long represented a bargaining unit of about fifty production and maintenance employees at the Montoursville plant.[7]  The parties' most recent collective bargaining agreement expired on December 2, 2017.[8]  The parties reached agreement on a successor contract, but the Union's membership rejected that agreement on December 5, 2017.[9]

On March 21, 2018, the parties started bargaining again.  The Union's bargaining team consisted of a Union staff representative and three Jersey Shore Montoursville employees: Local Union President Zachary Taylor, Local Union Recording Secretary Ryan Stout, and Local Union Griever Adrian Brown.[10]  Jersey Shore initially offered a new proposal that was by and large regressive compared

---

the Court has enough information before it to grant the Regional Director's Petition, which, as may be obvious, provides only temporary, limited relief.  Jersey Shore will have the opportunity to contest the Regional Director's case in fuller fashion before an administrative law judge at the June 22 hearing.  *See Kennedy for & on Behalf of N. L. R. B. v. Sheet Metal Workers Int'l Ass'n Local 108*, 289 F. Supp. 65, 89-90 (C.D. Cal. 1968) (Section 10(l) proceedings did not require the presentation of oral testimony, as "the function of the courts" in these cases was more limited); *see also Pang-Tsu Mow v. Republic of China*, 201 F.2d 195, 199 (D.C. Cir. 1952) ("detailed affidavit" with exhibits accompanied by "the sworn complaint" "furnished adequate basis" for trial judge's decision to grant preliminary injunction); *Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 893 (1st Cir. 1988) ("[A]n evidentiary hearing is not an indispensable requirement when a court allows or refuses a preliminary injunction.").

[7]   *See, e.g.*, Doc. 6-2 Ex. C at ¶¶ 2-3.

[8]   Doc. 6-2 Ex. C at ¶ 4.

[9]   *See* Doc. 6-2 Ex. A at ¶ 3; Doc. 6-3 Ex. N at ¶ 7.

[10]   *See* Doc. 6-3 Ex. N at ¶ 5; Doc. 6-2 Ex. C at ¶ 5.

with the previous contract, with Jersey Shore asserting that these changes were a response to employees' rejection of the previous tentative agreement. For the next nine months or so, Jersey Shore offered regressive bargaining proposals and retreated from agreed-upon proposals.[11]

On December 12, 2018, Jersey Shore presented a new proposal to the Union,[12] asking that the Union simply present this proposal to its employees without commenting negatively on it. The Union agreed.[13] On December 13, 2018, Jersey Shore began to distribute its proposal to employees. That same date, Jersey Shore's chief negotiator called the Union staff representative and angrily stated that he wanted Taylor, Stout, and Brown "out of his building" because they were allegedly negatively commenting on Jersey Shore's proposal to employees.[14]

On December 17, 2018, Jersey Shore held a mandatory meeting for its Montoursville employees. In those meetings, Jersey Shore told employees that the Union was responsible for Jersey Shore's inability to provide wage increases, that Jersey Shore was meeting directly with employees because it did not believe that employees had faith in the Union, and that the Union was responsible for the lack of bargaining progress.[15] Jersey Shore also threatened employees, saying that the

---

[11]  *See* Doc. 6-3 Ex. N at ¶¶ 8-14; Doc. 6-2 Ex. F at ¶ 3.

[12]  Doc. 6-3 Ex. N at ¶ 15.

[13]  Doc. 6-2 Ex. F at ¶ 9.

[14]  Doc. 6-2 Ex. F at ¶ 10; Doc. 6-3 Ex. N at ¶¶ 17-18.

[15]  Doc. 6-3 Ex. M at ¶ 5.

Union would no longer represent them and Jersey Shore would not maintain the existing terms and conditions of employment at the Montoursville plant.[16]  At this meeting, and another employee meeting the following day, Jersey Shore also bypassed the Union's representation by asking employees what they wanted in a contract.[17]  At the December 18, 2018 employee meeting, Jersey Shore made implied threats to employees that it would not maintain the existing terms and conditions of employment.[18]

In December 2018, Jersey Shore unilaterally ceased notifying the Union when it hired new employees, no longer allowed union representatives to meet with new employees on the clock; and stopped providing new employees orientation material to the Union.[19]

### A.  Jersey Shore's Suspension and Discharge of the Union's Three Bargaining Representatives

In early January 2019,[20] Local Union Griever Brown advised a probationary employee that he was eligible to bid on a job that would be awarded after his probationary period ended.[21]  On January 8, Local Union President Taylor and

---

[16]  *Id.*

[17]  Doc. 6-3 Ex. N at ¶ 19.

[18]  *Id.*

[19]  Doc. 6-3 Ex. N at ¶¶ 22-24.

[20]  All dates after this point refer to the year 2019.

[21]  Doc. 19-2 Ex. C at ¶ 18.

Local Union Recording Secretary Stout solicited a union authorization card from a temporary employee assigned to the Montoursville facility by a staffing agency.[22]

On February 1, prior to a planned bargaining session, Jersey Shore suspended the three bargaining committee members – Taylor, Stout and Brown – for, among other things, allegedly harassing employees and providing false information.[23]  Also, on February 1, February 6 and February 7, Jersey Shore held mandatory meetings at which it told its employees that it was going to terminate the committee members for allegedly harassing and intimidating their coworkers;[24] and that it would not negotiate with nonemployees.[25]  Jersey Shore also threatened that if the employees chose to strike, it would cease operations;[26] that the employees would not be eligible for unemployment compensation benefits;[27] and informed them that Jersey Shore could operate the facility as it pleased, without bargaining with the Union.[28]

At the same time, Jersey Shore bypassed the Union by distributing portions of contract proposals it had not yet presented at the bargaining table.[29]  Jersey

---

[22]   Doc. 19-12 Ex. M at ¶ 8.

[23]   Doc. 6-4 Exs. R.1, R.2, R.3.

[24]   Doc. 19-14 Ex. O at ¶ 4.

[25]   Doc. 19-10 Ex. K at ¶ 4.

[26]   Doc. 19-14 Ex. O at ¶ 4.

[27]   Doc. 19-14 Ex. O at ¶ 5.

[28]   Doc. 19-8 Ex. I at ¶ 6.

[29]   Doc. 19-14 Ex. O at ¶ 4.

Shore informed employees that since they rejected a contract 15 months earlier, Jersey Shore intended to take its management right to have an open shop and have union, nonunion, and contract employees working in the facility.[30]  Aware that employees had a strike vote scheduled for the near future, Jersey Shore also warned employees that the owner might choose to close the plant.[31]

On February 7, Jersey Shore formally terminated the three bargaining committee members: Taylor, Stout, and Brown.[32]  None of the three had previous discipline that would have supported a discharge at this time.

On the same date, Jersey Shore held another mandatory meeting at which it wrote three website addresses on a whiteboard and told employees that if they were interested in leaving the Union, they should visit one of the websites.[33]  On February 11, at another mass employee meeting, Jersey Shore reiterated that the Union was to blame for delays in bargaining.[34]  Over the remaining weeks of February, eight employees resigned their Union membership, with some citing the Union's ineffectiveness in bargaining as the reason.[35]  And Jersey Shore continued

---

[30]   Doc. 19-10 Ex. K at ¶ 4.

[31]   Doc. 19-14 Ex. O at ¶ 4; Doc. 19-11 Ex. L at ¶ 3.

[32]   Doc. 6-4 Exs. S.1, S.2, S.3.

[33]   Doc. 19-11 Ex. L at ¶¶ 2-3; Doc. 19-14 Ex. O at ¶ 6.

[34]   Doc. 19-11 Ex. L at ¶ 6.

[35]   *See, e.g.*, Doc. 19-1 Ex. B at ¶¶ 5-8; Doc. 19-3 Ex. D at ¶ 2.

its practice of dealing directly with employees by speaking with them about receiving pay raises.[36]

Notwithstanding the fact that the three bargaining committee members were terminated, they continued to bargain on behalf of the Union. The parties met again for bargaining on February 22. They continued to meet regularly until August 30. [37]

## B.   Jersey Shore Fails to Provide the Union with Requested Information[38]

On February 22, the Union requested information related to Jersey Shore's current disciplinary policy and all discipline issued under that policy since the previous year, as well as information related to employees' pension contributions. Jersey Shore, claiming the Union already had disciplinary information, refused to comply with that request and did not respond to the Union's request for pension information. On March 4, the Union requested information regarding Jersey Shore's financial statements, a list of employees, and information regarding profit-sharing. Jersey Shore refused to comply with that request. On May 3, the Union requested information regarding employees' production bonuses. Jersey Shore did not respond. On May 14, the Union requested information regarding the preparation of Jersey Shore's payroll. Jersey Shore refused to comply with that

---

[36]   Doc. 19-11 Ex. L at ¶ 8.

[37]   *See* Doc. 19-7 Ex. H at ¶¶ 15-35.

[38]   *See* Doc. 19-6 Ex. G and Doc. 19-7 Ex. H.

request.  On May 21, the Union reiterated its requests for information regarding pension contributions and production bonuses, but again, Jersey Shore did not reply.

On August 6 and 22, the Union requested information related to Jersey Shore's FMLA and drug policies, progressive disciplinary policy, and copies of all disciplines for violations of Jersey Shore's drug and alcohol policies since 2014. Jersey Shore refused to provide the requested information, citing the management rights clause in the expired collective bargaining agreement.

On September 9, the Union requested information regarding production and attendance bonuses paid to employees, as well as information about the employees in the Unit at that time. Jersey Shore did not reply.

### C.    Jersey Shore Continues To Bargain In Bad Faith

On June 4, in response to Jersey Shore's request, the Union presented to Jersey Shore a list of provisions upon which the parties had reached agreement, as well as a list of provisions on which the Union had moved toward Jersey Shore's position.[39]  On August 30, Jersey Shore presented a new proposal that contained a wage increase, but also changed or omitted many terms to which the parties had previously agreed, or to which the Union had agreed to move in Jersey Shore's direction.[40]  The proposal added a more sweeping management rights clause,

---

[39]   Doc. 19-7 Ex. H at ¶ 30.

[40]   *See* Doc. 6-4 Ex. T; Doc. 19-7 Ex. H at ¶ 35.

limited the time in which employees could file a grievance and then appeal to an arbitrator, and granted Jersey Shore much greater discretion over discipline and bonuses.[41]  This proposal also included language that was predictably unacceptable to the Union, such as not requiring employees to join or maintain membership in the Union as a condition of employment, and not deducting or remitting dues on behalf of the Union.[42]

More significantly, the August 30 proposal contained "clean slate" language that obligated the Union to withdraw all pending unfair labor practice charges, including over the three discharged bargaining committee members.[43]  Without asking for the Union's permission, and without discussing its new proposals with the Union, Jersey Shore presented the proposal to employees at a mass meeting that same day.[44]

On about September 6, the Union sent an email message to Jersey Shore protesting that the August 30 proposal was regressive and objecting to Jersey Shore's proposal that the Union drop pending unfair labor practice charges, including those concerning the discharges of Brown, Stout and Taylor.[45]  Over the

---

[41]  In August, in the midst of this bargaining, Jersey Shore also unilaterally implemented a break policy requiring employees to sign in and sign out using a log sheet.  *See* Doc. 19-9 at ¶ 11.

[42]  Doc. 6-4 Ex. T at 1.

[43]  Doc. 6-4 Ex. T, Appendix E at 26.

[44]  *See* Doc. 19-7 Ex. H at ¶¶ 38-39.

[45]  Doc. 19-7 Ex. H at ¶ 41.

next week the parties exchanged eleven pieces of correspondence. In its letters, Jersey Shore disparaged the Union and misrepresented the Union's bargaining position, criticized the Union for refusing to take its August 30 proposal to a vote in order to protect the terminated committee members, and blamed the Union for holding "power" over employees. Jersey Shore posted the parties' correspondence at its facility.[46]

### D.    Jersey Shore Withdraws Recognition From the Union

In early September, a unit employee began circulating a disaffection petition.[47]  Within approximately one week he obtained thirty-one signatures out of a unit of approximately fifty employees.[48] On September 11, Jersey Shore notified the Union that it had received objective evidence that the Union had lost majority support.  Jersey Shore withdrew recognition.[49]

After withdrawing recognition, Jersey Shore called mass meetings of employees.  At these meetings, Jersey Shore announced the withdrawal of recognition; announced it was implementing the wage and bonus provisions of its August 30 proposal to the Union; and announced that it was implementing terms and conditions of employment via a new employee handbook.[50]

---

[46]   Doc. 19-15 Ex. P at ¶¶ 6-8.

[47]   *See* Doc. 19-9 Ex. J at ¶ 10; Doc. 19-15 Ex. P at ¶ 3.

[48]   Doc. 6-4 Ex. U.

[49]   Doc. 6-4 Ex. V.

[50]   *See* Doc. 19-9 Ex. J at ¶ 7; Doc. 19-15 Ex. P at ¶¶ 4-5.

Employees who signed the disaffection petition testified that they did so because, among other things, they felt the Union was more interested in fighting for the discharged committee members than reaching a new collective-bargaining agreement, they were concerned that the Union would not take Jersey Shore's contract proposal to a vote, and they had an impression that the Union was ineffective.[51]

## III.   LEGAL STANDARDS FOR ISSUING AN INJUNCTION UNDER SECTION 10(J) OF THE ACT[52]

"In determining whether interim relief is appropriate under § 10(j), a district court must evaluate whether there is 'reasonable cause' to believe that an unfair labor practice has occurred and whether an injunction would be 'just and proper.'"[53]

### A.   "Reasonable Cause"

A district court's "reasonable cause" analysis follows two steps.  "First, there must be a substantial, non-frivolous, legal theory, implicit or explicit, in the

---

[51]  *See, e.g.*, Doc. 19-16 Ex. Q at ¶¶ 4-7; Doc. 19-4 Ex. E at ¶ 3; Doc. 19-1 Ex. B at ¶¶ 2-8.

[52]  The Honorable Robert D. Mariani, my colleague in this District, dealt with a Section 10(j) petition just last year.  I appreciate Judge Mariani's thorough and cogent explanation of these governing legal standards.  *See Walsh v. Mountain View Care & Rehab. Ctr., LLC*, No. 3:19-CV-1079, 2019 WL 2865891 at *5-*8 (M.D. Pa. July 2, 2019).

[53]  *Pascarell ex rel. N.L.R.B. and Int'l Ladies Garment Workers Union v. Vibra Screw Inc.*, 904 F.2d 874, 877 (3d Cir. 1990).

Board's argument, and second, taking the facts favorably to the Board, there must be sufficient evidence to support that theory."[54]

## B.     "Just and Proper"

Whether an injunction would be "just and proper" depends on whether "it is in the public interest to grant the injunction, so as to effectuate the policies of the National Labor Relations Act or to fulfill the remedial function of the Board."[55] "[T]he focus in a § 10(j) determination is on the public interest, and the unusual likelihood of ultimate remedial failure by the NLRB."[56]  "[T]he critical determination is whether, absent an injunction, the Board's ability to facilitate peaceful management-labor negotiation will be impaired."[57]  This standard "is intended to limit the district court's role" by "cabining the otherwise unfettered discretion of the district court to fashion labor law under section 10(j) wholly according to its own notions of fairness and efficiency."[58]

The United States Court of Appeals for the Third Circuit explained this evaluation as such in *Hirsch ex rel. N.L.R.B. v. Dorsey Trailers, Inc.*[59]

> In evaluating whether to issue an injunction under the "just and proper" prong, a district court should discuss and determine whether the failure to grant interim injunctive relief would be likely to prevent the Board,

---

[54]   *Id.* at 882.

[55]   *Chester ex rel. N.L.R.B. v. Grane Healthcare Co.*, 666 F.3d 87, 98-99 (3d Cir. 2011).

[56]   *Hirsch v. Dorsey Trailers, Inc.*, 147 F.3d 243, 247 (3d Cir. 1998) (cleaned up).

[57]   *Vibra Screw*, 904 F.2d at 879.

[58]   *Chester*, 666 F.3d at 99-100 (internal citations and quotations omitted).

[59]   *Dorsey Trailers*, 147 F.3d at 247-48 (cleaned up).

acting with reasonable expedition, from effectively exercising its ultimate remedial powers. The critical determination is whether, absent an injunction, the Board's ability to facilitate peaceful management-labor negotiation will be impaired. This requires an assessment of the likelihood of harm to the bargaining process absent an injunction. Unless there are circumstances, like the size, intimacy and longevity of the bargaining unit, which indicate that the bargaining process will not be harmed, courts must be deferential to the Board's determination that the integrity of the process needs interim protection. The § 10(j) analysis must be guided by the particular facts in each case.

## IV.   APPLICABLE LAW CONCERNING UNDERLYING UNFAIR LABOR PRACTICES

### A.   Section 8(a)(1) - Interference; Restraint; Coercion

Section 8(a)(1) of the Act makes it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of" their rights to organize and practice collective bargaining.[60]  To establish a violation, "it need only be shown that under the circumstances existing, [the employer's conduct] may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act."[61]

### B.   Section 8(a)(3) - Discrimination

Section 8(a)(3) of the Act makes it an unfair labor practice to discriminate "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."[62]  Under the

---

[60]   29 U.S.C. § 158(a)(1).

[61]   *1621 Route 22 W. Operating Co., LLC v. Nat'l Labor Relations Bd.*, 825 F.3d 128, 146 (3d Cir. 2016) (citation omitted).

[62]   29 U.S.C. § 158(a)(3).

*Wright Line* test, which the United States Supreme Court approved in *N.L.R.B. v. Transportation Management Corporation*,[63] "the employee must [first] establish that the protected conduct was a 'substantial' or 'motivating' factor [for the employer's action]. Once this is accomplished, the burden shifts to the employer to demonstrate that it would have reached the same decision absent the protected conduct."[64]

### C.    Section 8(a)(5) - Refusal to Bargain

Section 8(a)(5) of the Act makes it an unfair labor practice "to refuse to bargain collectively with the representatives" of an employer's employees.[65]  "[A]n employer must provide a union with requested information if it will be of use to the union in fulfilling its statutory duties and responsibilities as the employees' exclusive bargaining representative."[66]

## V.    DISCUSSION

### A.    "Reasonable Cause"

The Court makes the preliminary determination that the legal theory that the Regional Director has advanced is substantial and not frivolous.  Further, there is sufficient evidence to support this non-frivolous theory.  Based on the litany of

---

[63]   462 U.S. 393, 402 (1983), *abrogated by Dir., Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267 (1994),

[64]   *Wright Line*, 251 N.L.R.B. 1083, 1087 (1980).

[65]   29 U.S.C. § 158(a)(5).

[66]   *N.L.R.B. v. U.S. Postal Serv.*, 18 F.3d 1089, 1100 (3d Cir. 1994).

facts and the chronology that I have described above, the Court finds that there is

reasonable cause to believe that:

1) Jersey Shore has been interfering with, restraining, and coercing its employees in the exercise of their rights to organize and practice collective bargaining.[67]
2) Jersey Shore has been discriminating in regard to hire or tenure or terms or conditions of employment of its employees to discourage membership in a labor organization.[68]

3) Jersey Shore has been refusing to bargain collectively with the representatives of its employees.[69]

---

[67] *Delmas Conley d/b/a Conley Trucking & Gen. Truck Drivers & Helpers Union Local #92, Int'l Bhd. of Teamsters*, 349 NLRB 308, 319 (2007) ("threat of reprisal for union activity," including "an implicit threat of termination," constitutes unlawful coercion); *Prudential Ins. Co.*, 317 NLRB 357, 357 (1995) (employer's disparaging and negative comments about the Union and the grievance process constitutes interference of employee's exercising of their rights); *Wayne J. Griffin Elec., Inc. & Int'l Bhd. of Elec. Workers, Local 103, Afl-Cio*, 335 NLRB 1362, 1373 (2001) (employer statements that "convey the impression that employee support for a union will be futile" "have the tendency to interfere with, restrain, and coerce employees in the exercise of Section 7 rights"); *see also Pascarell for & on Behalf of N.L.R.B. v. Vibra Screw Inc.*, 904 F.2d 874, 881 (3d Cir. 1990) (when "management had fired the few employees who had been the most open in their support for the union," this was "precisely the kind of message, and action, that the NLRA prohibits").

[68] *See Kitsap Tenant Support Servs., Inc.*, 366 NLRB No. 98, slip op. at *14 (May 31, 2018) (in this analysis, "[u]nlawful employer motivation may be established by circumstantial evidence, including, among other things, (1) the timing of the employer's adverse action in relationship to the employee's protected activity, (2) the presence of other unfair labor practices, (3) statements and actions showing the employer's general and specific animus, (4) the disparate treatment of the discriminatees, (5) departure from past practice, and (6) evidence that an employer's proffered explanation for the adverse action is a pretext.").

[69] *See Regency Serv. Carts, Inc. & Shopmen's Local Union No. 455, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Afl-Cio*, 345 NLRB 671, 671-75 (2005) (factors when evaluating a party's potential bad-faith bargaining include "the nature of the bargaining demands," "unilateral changes in mandatory subjects of bargaining," "efforts to bypass the union," "withdrawal of already agreed-upon provisions," and a "delay in providing the Union with relevant information," *inter alia*); *Yp Advert. & Publ'g LLC & Int'l Bhd. of Elec. Workers, Local 1269*, 366 NLRB No. 89 (May 16, 2018) (dealing directly with employees and "unreasonably delaying in furnishing relevant information that the Union requested" constituted violations of Section 8(a)(5)); *Fruehauf Trailer Services*, 335 NLRB 393, 394 (2001) (withdrawal of recognition in the midst of refusal to bargain weighs in favor of finding that employer had "tainted" decertification petition).

### B.     "Just and Proper"

Considering the Court's public interest focus in this prong of the analysis,

and the accompanying focus on the Board's ultimate ability to exercise its remedial

powers, the Court finds that the injunctive relief that the Regional Director seeks is

just and proper.  Simply put, the conduct that I have described above has the broad

effect of sapping employees' support for the Union and depriving those employees

of the benefits of collective bargaining and of their Union representation.[70]  If the

Court does not act now to correct the above conduct and place things at the

Montoursville plant back to the pre-conduct status quo, the above conduct will

take the teeth out of any ultimate order that the Board issues by draining employee

support for the Union.[71]  This will increase the likelihood of the Board's "ultimate

remedial failure," dull the Board's ability to "fulfill [its] remedial function," and

impair "the Board's ability to facilitate peaceful management-labor negotiation."

---

[70]   *See, e.g.*, *Asseo v. Centro Medico del Turabo, Inc.*, No. 89-0490CC, 1989 WL 130007, at *9 (D.P.R. Aug. 9, 1989), *aff'd sub nom. Asseo v. Centro Medico Del Turabo*, 900 F.2d 445 (1st Cir. 1990), *as modified sub nom. N.L.R.B. v. Hosp. San Rafael, Inc.*, 42 F.3d 45 (1st Cir. 1994) ("absent immediate recognition and bargaining, employees will also lose the benefits of representation, such as health and safety advocacy and grievance representation, which cannot be compensated by a final Board order"); *Pascarell for & on Behalf of N.L.R.B. v. Vibra Screw Inc.*, 904 F.2d 874, 881 (3d Cir. 1990); *see Chester ex rel. N.L.R.B. v. Grane Healthcare Co.*, 666 F.3d 87, 102-03 (3d Cir. 2011); *see also Asseo v. Centro Medico del Turabo, Inc.*, 900 F.2d 445, 454 (1st Cir. 1990) (recognizing that erosion of employee support jeopardizes union's ability to represent employees).

[71]   *See, e.g.,* Doc. 19 at ¶ 16 (employee's comments including "At this point, I do not feel that the Union can do anything for employees"); Doc. 19-3 at ¶ 5 (employee's comments including "I signed the petition to get rid of the Union because I feel I can stand on my own merit"); Doc. 19-4 at ¶ 3 (employee's comments including "The Union Committee was not doing anything to help the guys working on the floor. . . . Employees were tired of this so it was time for the Union to go").

The Court analyzes a subset of the individual elements of the Regional

Director's requested relief below.

1) <u>Recognition and good-faith bargaining</u>: In *Chester ex rel. N.L.R.B. v. Grane Healthcare Co.*, the United States Court of Appeals for the Third Circuit held that such an order was just and proper relief when a union has already "lost significant support" and the order "is necessary to preserve the fruits of the collective bargaining process that otherwise would have been available to the employees prior to such an order."[72] Further, the United States Court of Appeals for the Ninth Circuit has recognized that this remedy has the potential to "restore the employees' interest in the Union."[73]

2) <u>Interim reinstatement</u>: In *Angle v. Sacks for & on Behalf of N. L. R. B.*, the United States Court of Appeals for the Tenth Circuit approved the district court's reinstatement of discharged employees as just and proper, as this was the "best visible means of rectifying" the employer's work in "destroying any employee interest or initiative in union representation and collective bargaining."[74]  The Court finds the case before it analogous and agrees with the Tenth Circuit's reasoning.[75]

3) <u>Rescission of suspensions</u>: In a recent decision in this District, United States District Judge Robert D. Mariani found rescission of a discharged employee's suspension just and proper.[76]  This comports with other district courts around the country.[77]  And this Court agrees.

---

[72]  666 F.3d 87, 102-03 (3d Cir. 2011).

[73]  *Scott ex rel. N.L.R.B. v. Stephen Dunn & Assocs.*, 241 F.3d 652, 669 (9th Cir. 2001).

[74]  382 F.2d 655, 660-61 (10th Cir. 1967).

[75]  *See also Vibra Screw*, 904 F.2d at 878, 881-882 (interim reinstatement of six active union members); *Eisenberg for & on Behalf of N. L. R. B. v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 905-07 (3d Cir. 1981) (interim reinstatement of five negotiating committee members and three other active union supporters).

[76]  *See Walsh v. Mountain View Care & Rehab. Ctr., LLC*, No. 3:19-CV-1079, 2019 WL 2865891 (M.D. Pa. July 2, 2019).

[77]  *See, e.g.*, *Lindsey v. Shamrock Cartage, Inc.*, 2018 WL 6528432, at *5 (S.D. Ohio 2018) (suspension); *Blyer v. Domsey Trading Corp.*, 1991 WL 150817, at *2 (E.D.N.Y. 1991) (interim rescission of warnings and other discriminatory discipline).

4) <u>Rescission of unilateral changes to the terms and conditions of employment</u>: Such a remedy allows for an even playing field for bargaining and prevents Jersey Shore from getting an improper benefit from the bargaining advantage that it enjoyed in the absence of Union representation.[78]

## VI.   CONCLUSION

For the foregoing reasons, the Court finds that the Regional Director has met her burden with respect to the NLRB's entitlement to injunctive relief pursuant to Section 10(j) of the Act pending the final disposition of the matters involved and pending before the Board.  The Regional Director of the Sixth Region of the National Labor Relations Board's Petition for Injunction under Section 10(j) of the National Labor Relations Act, as Amended (Doc. 1) will therefore be granted.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[78] *See Kreisberg v. HealthBridge Mgmt., LLC*, 732 F.3d 131, 143 (2d Cir. 2013) (interim rescission of unilateral changes was necessary to avoid bargaining "in the shadow of work conditions unilaterally imposed" by the employer); *Harrell ex rel. N.L.R.B. v. Am. Red Cross, Heart of Am. Blood Servs. Region*, 714 F.3d 553, 558 (7th Cir. 2013); *Silverman v. Major League Baseball Player Relations Comm., Inc.*, 880 F. Supp. 246, 259 (S.D.N.Y. 1995), *aff'd*, 67 F.3d 1054 (2d Cir. 1995) (interim rescission of unilateral changes appropriate to "salvage some of the important bargaining equality that existed" prior to violations).